**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RCP PUBLICATIONS INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 11398** |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Employees of the City of Chicago issued RCP Publications Inc. a ticket for a sign advertising a movie screening that was affixed to a city-owned streetlight pole.  Posting "commercial advertising material" to City property is a violation of section 10-8-320 of the Chicago Municipal Code.  RCP contends that section 10-8-320 is an unconstitutional restriction on speech, void for vagueness, and overbroad.  Both RCP and the City of Chicago have moved for summary judgment.  RCP has also moved to exclude the City's expert witnesses.

**Background**

RCP publishes and distributes a variety of pamphlets, movies, books, posters, and other materials containing political messages.  It also operates a website that makes books, newspapers, and DVDs available for purchase.  In July 2014, a poster that promoted a film, "Revolution and Religion:  The Fight for Emancipation and the

Role of Religion" was affixed to a streetlight pole.[1]  RCP made the advertised film available for download or purchase on its website and sold tickets for a screening of the film.  The parties dispute whether RCP sponsored the screening.  On July 14, 2015, RCP received notice that a poster attached to a City streetlight pole may have violated section 10-8-320 of the Chicago Municipal Code, which the Court will refer to as the sign ordinance.  The sign ordinance states:

> No person shall distribute or cause others to distribute, as defined in Section 10-8-325, commercial advertising material by means of posting, sticking, stamping, tacking, painting or otherwise fixing any sign, notice, placard, bill, card, poster, advertisement or other device calculated to attract the attention of the public, to or upon any sidewalk, crosswalk, curb or curbstone, flagstone or any other portion or part of any public way, lamppost, electric light, traffic light, telegraph, telephone or trolley line pole, hydrant, shade tree or tree-box, or upon the piers, columns, trusses, girders, railings, gates or parts of any public bridge or viaduct, or upon any pole box or fixture of the police and fire communications system, except such as may be required by the laws of the state and the ordinances of the city, or on any bus shelter, except that the city may allow the posting of decorative banners in accordance with Section 10-8-340 below.

Chi. Mun. Code § 10-8-320(a) (for ease of reference, the Court will refer generally to the extensive list of municipal property cited in the ordinance as "City property").  The sign ordinance does not define "commercial advertising material."  Before the Chicago City Council amended the ordinance in 2007, the ordinance's ban on signs was not limited to "commercial advertising material."

At a hearing on October 15, 2015, an Administrative Law Judge (ALJ) found that RCP owned the offending poster.  At a subsequent hearing, the ALJ held that RCP was liable for violating section 10-8-320(a) on the ground that the poster contained a

---

[1] RCP does not dispute that the poster at issue was based upon a version that RCP made available on its website.  Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶¶ 23-24.

commercial message. RCP had the option to appeal the ALJ's decision, but it did not do so. Since receiving the citation, RCP has continued to publish its materials, which include posters, and it has not tried to warn others not to post its materials.

RCP alleges that the sign ordinance's regulation of speech violates the First Amendment. In September 2016, the Court denied the City's motion to dismiss RCP's complaint. *RCP Publ'ns, Inc. v. City of Chicago*, 204 F. Supp. 3d 1012 (N.D. Ill. 2016). In January 2017, RCP filed an amended complaint on behalf of a putative class. In May 2017, the Court certified, without objection by the City, a plaintiff class consisting of "all persons who have been ticketed since December 21, 2013, under Municipal Code of Chicago § 10-8-320."

## Discussion

Both sides have moved for summary judgment. The City supports its motion with reports from expert witnesses. The Court first reviews RCP's motion to exclude the City's expert witnesses and then considers the parties' motions for summary judgment.

## I.      Motion to exclude

Federal Rule of Evidence 702 governs the admission of opinion testimony by expert witnesses. Rule 702 requires a district court "to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citation omitted). RCP argues that the City's expert witnesses, Michael Kuzel and Sam Karow, should be excluded on the ground that neither offers testimony that would be helpful to a factfinder.

3

## A.    Michael Kuzel

Kuzel is an expert in the study of "human factors," which is the study of how products, tasks, and environments may be created to meet the needs of human users in a system.  D.E. 69, Pl.'s Ex. 18 at 1 (Kuzel Expert Rep.).  Kuzel describes how advertisements are intended to capture the attention of persons who perceive them and therefore have an effect on those passing by the advertisement.  *Id.* at 5.  He opines that (1) posted signs can distract drivers, "leading to decrements in performance and erratic behaviors," (2) the placement and number of signs may make it more difficult for drivers to detect hazards, and (3) the sign ordinance is "an appropriate response" to the hazards that advertising in the public way creates.  *Id.* at 9.

RCP's primary contention is that Kuzel's testimony is not relevant, because it concerns the traffic safety effects of all signs, not just the commercial signs affected by the sign ordinance.  That does not make Kuzel's testimony irrelevant.  The City has asserted an interest in reducing the adverse traffic safety effects of signs posted to City property, and there is evidence that commercial signs make up the largest proportion of such signs.  Moreover, Kuzel also states that "[a]dvertisements have also been found to attract significantly more glances than other road signs," which indicates that, at least in certain instances, he has compared the effects of different types of signs.  *Id.* at 5.

The Court also overrules RCP's other arguments for excluding Kuzel's opinions.  RCP contends that Kuzel's testimony is irrelevant because it assumes that the alternative to the sign ordinance is unregulated posting on City property, rather than a newly-drafted ordinance with different sorts of restrictions, for example, on the number of postings.  In addition, RCP argues that Kuzel's testimony should be excluded

because it does not adequately take into consideration the facts of this litigation. These are not grounds to exclude Kuzel's testimony. Neither argument suggests that Kuzel's opinions are unhelpful, even if those opinions might not, in and of themselves, establish the validity of the sign ordinance. His opinions indisputably bear on the question of whether the ordinance advances the City's asserted interest in traffic safety.

Finally, RCP contends that a factfinder does not need expert testimony to understand that drivers may be distracted by posted signs. This argument, however, is undercut by arguments RCP has advanced in its briefs. RCP argues that "the City has not offered a single instance of a posting (commercial or otherwise) on City property causing an accident or incident supporting the City's claim that [the ban] is necessary . . . to advance traffic safety." Pl.'s Reply in Supp. of Mot. for Summ. J. at 9. Kuzel's testimony, therefore, is helpful and properly admissible, for it provides information that bears on a point that RCP itself calls into question.

### B.    Sam Karow

RCP also contends that Sam Karow, the City's second expert witness, should be excluded. Karow is an expert in advertising and communications. D.E. 69, Pl.'s Ex. 19 at 2 (Karow Expert Rep.). His report describes how commercial advertisers wish to reach many viewers with their ads, how outdoor signs constitute a cheap and effective means of reaching views, and how "[r]evising or removing" the ordinance would produce an increase in the number of signs posted to City property. Karow opines that, because of the popularity, ease, and effectiveness of outdoor signs as advertising techniques, *id.* at 5-6, lifting the ordinance would produce a "massive proliferation" of posted signs on City property. *Id.* at 14.

RCP contends that Karow's testimony should be excluded because it is assumes that, if the sign ordinance is found unconstitutional, the City would be unable to replace the ordinance with some other constitutionally appropriate restriction. RCP also argues that whether the sign ordinance ensures fewer commercial signs is irrelevant in determining the constitutionality of the current ordinance. The Court disagrees. The City's argument is that signs posted to City property burden its interests and that, by enforcing the sign ordinance, it has reduced the adverse effects of commercial signs, the single largest source of posted signs. Given this contention, Karow's expert testimony that the ordinance prevents a "massive proliferation" of signs is relevant to assessing the City's assertion that the ordinance assists in minimizing the adverse impact of commercial signs. *See also Smith*, 215 F.3d at 721 ("[U]nder Rule 702, expert testimony need only be relevant to *an* issue in the case; it need not relate directly to the ultimate issue.").

For these reasons, the Court denies RCP's request to bar the City's expert witnesses.

## II.    Motions for summary judgment

The Court next turns to the parties' motions for summary judgment. The City contends that the sign ordinance is a permissible regulation of commercial speech. RCP argues the opposite and also contends that the sign ordinance is impermissibly vague and unconstitutionally overbroad. RCP asserts facial and as-applied challenges.

### A.    Regulation of commercial speech

#### 1.    The applicable standard

The City argues that the sign ordinance is a valid regulation of commercial

speech, which is afforded "a lesser protection" under the First Amendment than "other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 557, 562-63 (1980).  The Supreme Court has established a four-step analysis for determining whether a regulation of commercial speech meets the First Amendment's requirements:

- whether the expression is protected by the First Amendment; at a minimum, it must concern lawful activity and not be misleading;

- whether the government's interest is substantial;

- whether the regulation "directly advances the governmental interest asserted"; and

- whether the regulation "is not more extensive than is necessary to serve that interest."

*Id.* at 566.  The parties dispute the application of the *Central Hudson* standard—specifically the last two steps—and each side's arguments on these points are intertwined to some extent.  The Supreme Court anticipated this:  "[t]he last two steps of *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986).

RCP contends that the *Central Hudson* inquiry must be applied with "special care," consistent with the Supreme Court's admonition that "regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy" must be reviewed with "special care." *Cent. Hudson*, 447 U.S. at 566 n.9.  Along the same lines, in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), the Supreme Court

concluded that there was "far less reason to depart from the rigorous review that the First Amendment generally demands" when government "entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process" or when government "attempts to single out certain messages for suppression." *Id.* at 501.

The sign ordinance, however, is not the type of restriction that triggers the enhanced level of scrutiny referenced in these cases. Specifically, the ordinance does not single out certain types of messages for restriction, and it is not a "complete ban on commercial speech." *Id.* The restriction at issue in *44 Liquormart* was a statute that prohibited "advertising in any manner whatsoever the price of any alcoholic beverage offered for sale in the [s]tate." *44 Liquormart*, 517 U.S. at 490. In considering this statute, the Court noted that its commercial-speech cases had consistently recognized "the dangers that attend governmental attempts to single out certain messages for suppression" and failed to leave open satisfactory alternative channels of communication. *See id.* at 501-02. For instance, in *Linmark Associates, Inc. v. Willingboro Township*, 431 U.S. 85 (1977), the Supreme Court struck down a prohibition on real estate "For Sale" signs as a near-total ban on real estate advertising, given the inadequacy of alternative channels to advertise real estate that were available at the time. Similarly, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), the Court struck down what it characterized as the Virginia legislature's attempt to "completely suppress" prescription drug price advertisements in any form. *Id.* at 771, 773.

In short, the heightened scrutiny referenced in *44 Liquormart* and *Central Hudson*

applies when a governmental entity imposes a "total ban" on certain types of commercial speech: alcohol prices in *44 Liquormart*, pharmacy prices in *Virginia Board*, and real estate prices in *Linmark*. Where there are alternative channels of communication available, as in *Florida Bar*, the Supreme Court does not require heightened scrutiny. For example, in *Florida Bar v. Went for It, Inc.*, 515 U.S. 618 (1995), the Court upheld a Florida statute restricting attorneys from mailing solicitations to victims of accidents or disasters for thirty days after the catastrophic event, as there were "ample alternative channels" for lawyers to engage in commercial speech not affected by the mailing restriction. *Id.* at 620, 633. The Court did not apply any form of enhanced scrutiny even though such mailings were banned in their entirety during the thirty-day period.

The City of Chicago's sign ordinance does not single out any particular commercial advertising messages for prohibition. And any business or person wishing to advertise a product or service may do so through innumerable channels of communication other than bills posted on City property. The Court concludes that there is no basis to impose any higher degree of scrutiny than what *Central Hudson* itself requires in this case.

### 2.    The City's asserted interests

As indicated earlier, *Central Hudson* requires a governmental entity regulating commercial speech to establish that the regulation directly advances the interests the government has asserted to support the regulation. The City has identified a number of interests that it contends the sign ordinance advances: combatting litter, controlling visual clutter, preventing damage to City property, and promoting traffic safety. Def.'s

LR 56.1 Stmt. ¶ 36-57.  RCP does not dispute that signs can become litter, Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶¶ 36-38; that they produce visual clutter, *id.* ¶ 40; that the removal of signs can damage City property, *id.* ¶¶ 45-48; or that signs can obstruct sight lines and obscure traffic signs, affecting traffic safety.  *Id.* ¶¶ 43-44.  To be clear, the City does not argue that non-commercial signs do not impact these interests; rather, it argues that commercial signs have a significantly greater impact, because such signs constitute the overwhelming majority of signs posted on City property.

To support its contention, the City presents testimony from two witnesses.  First is Cole Stallard, a deputy commissioner with the Department of Streets and Sanitation. D.E. 61, Def.'s Ex. 1 at 8 (Stallard Dep.).  Stallard testified that the majority of signs posted to City property are commercial.  *Id.* at 110, 117.  Similarly, Linda Delgado, another employee at the Department of Streets and Sanitation, testified that "about 95 percent" of the signage removed from City property by the Department is commercial. D.E. 61, Def.'s Ex. 2 at 87, 95 (Delgado Dep.).  RCP does not present any evidence contradicting these contentions.  The City's evidence supports the findings of the Chicago City Council, which found when it adopted the sign ordinance that "[t]he distribution of commercial handbills . . . is the cause of a substantial, often overwhelming, amount of litter[.]"  Def.'s Resp. to Pl.'s LR. 56.1 Stmt. ¶ 14.  Thus the City argues that, for each of its asserted interests, "[c]ommercial advertising presents much more significant problems for the City than other types of posted bills because of its sheer volume."  Def.'s Mem. in Supp. of Mot. for Summ. J. at 5.  In sum, the City's evidence, which is unrebutted, is sufficient to establish that commercial signage burdens the City's asserted interests to a much greater extent than noncommercial

materials.

RCP argues that Delgado's testimony is unpersuasive; it contends that she does not have a good understanding of what constitutes "commercial advertising material" within the meaning of the sign ordinance. This argument is not compelling, as Delgado's description of how she distinguishes commercial signs from noncommercial signs does not suggest that she has included many noncommercial or arguably noncommercial signs in her statement that 95 percent of all signs posted are commercial. D.E. 61, Def.'s Ex. 2 at 87 (Delgado Dep.) (defines a sign as commercial if it is "advertising something, again, a business, an event, exchange of money, a service").[2] Moreover, the City has also offered Stallard's deposition testimony, which confirms Delgado's statements. D.E. 61, Def.'s Ex. 1 at 11 (Stallard Dep.). It is true, as RCP points out, that the City has not collected data or commissioned a study comparing the burdens imposed by commercial and noncommercial signs. But the law does not require this. In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), the Supreme Court, in reviewing a billboard ordinance under *Central Hudson*, "hesitate[d] to disagree with the accumulated, common-sense judgment[] of local lawmakers" as to the burdens that billboards imposed on the community, especially where there was "nothing . . . to suggest that these judgments are unreasonable." *Id.* at 509. The Court upheld the City of San Diego's restriction on billboards, even though it was justified by less than

---

[2] This in no way contradicts the Court's later discussion regarding the vagueness of the sign ordinance. *See Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015) (law may be impermissibly vague even if one can identify instances in which the law is clearly implicated).

the rigorous analysis that RCP seeks of the City of Chicago.  *Id.*[3]  In this case, as in

*Metromedia*, RCP has offered nothing suggesting that the City Council's judgment about

the relative proportion of commercial and non-commercial signs is unreasonable,

particularly in light of the deposition testimony the City has proffered.

The evidence that the City has proffered to support the sign ordinance

distinguishes this case from *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410

(1993), a case on which RCP relies.  In *Discovery Network*, the Supreme Court struck

down a Cincinnati ordinance that banned commercial newsracks and only commercial

newsracks, even though commercial newsracks constituted just 62 of the approximately

2,000 newsracks in Cincinnati.  *Id.* at 417.  Cincinnati officials justified their regulation of

commercial newsracks by their ugly appearance.  *Id.* at 425.  Yet, as the Court noted,

commercial and noncommercial newsracks were equally unattractive.  *Id.*  The Court

concluded that banning commercial newsracks but not noncommercial newsracks

"bears no relationship whatsoever to the particular interests that the city has asserted."

*Id.* at 424.  Rather, the Court concluded, lurking in the regulation was the city's judgment

that commercial speech had a lower value than other forms of speech.  *Id.* at 418-19

("The major premise supporting the city's argument is the proposition that commercial

speech has only a low value.").  But the Court also noted that it was not deciding

"whether, given certain facts and under certain circumstances, a community might be

able to justify differential treatment of commercial and noncommercial newsracks.  We

---

[3] Moreover, as Delgado's testimony indicates, doing a study of the type sought by RCP could be prohibitively disruptive to the City's everyday efforts to keep the city clean. D.E. 61, Def.'s Ex. 2 at 95 (Delgado Dep.) ("I know that it would be impossible for me to do it, as a ward superintendent, to document how many signs I take down, just for the sheer volume.").

simply hold that on this record Cincinnati has failed to make such a showing." *Id.* at 428.

Unlike the Cincinnati ordinance in *Discovery Network*, which failed to draw any link between the commercial aspect of the newsracks being regulated and the interests that Cincinnati asserted, the sign ordinance is supported by a link between the commercial character of the signs being regulated and the City's interests. The unrebutted evidence the City has offered indicates that the overwhelming majority of the burdens to the City's asserted interests caused by posted signs are imposed by commercial signs. Unlike the defendant in *Discovery Network*, the City has introduced evidence showing that the commercial character of signs posted to City property has a direct and significant impact on the interests that the City asserted to support the sign ordinance. Thus the Court finds unpersuasive RCP's contention that the City seeks to constrain "commercial messages (as a class) . . . as a way to address *a problem unrelated to commerce*." Pl.'s Mot. for Summ. J. at 22 (emphasis added).

RCP also argues that the City's evidence does not change the fact that commercial and noncommercial signs ultimately present the same issues: a commercial sign does not impose any burdens beyond those that a noncommercial sign imposes. That is not entirely correct: one of the City's expert witnesses has offered some evidence that advertisements are more distracting to those in traffic than other types of signs. D.E. 69, Pl.'s Ex. 18 at 5 (Kuzel Expert Rep.). But the central thrust of the City's justification for the sign ordinance is that there are far more commercial signs posted to the City's property than noncommercial signs, even though commercial signs are already unlawful under the sign ordinance (suggesting the disparity would be even

worse absent the ban).  The Court sees no basis to reject the proposition that the far greater volume of commercial signs justifies the City's decision to focus its regulation on that type of sign.

In sum, the City has sufficiently established that its ban on posting commercial signs on City property directly advances its asserted and legitimate interests in reducing litter, promoting traffic safety, reducing damage to City property, and advancing aesthetics, by banning all commercial signs, the type of signs that imposes the greatest adverse impact on these interests.

### 3.    RCP's underinclusiveness argument

RCP argues that by limiting its prohibition of signs to commercial signs posted on City property, the City has adopted an underinclusive ordinance that, for this reason, does not directly advance its asserted interests.  An ordinance that "provides only ineffective or remote support for the government's purpose" may not be upheld under *Central Hudson.  Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (quoting *Central Hudson*, 447 U.S. at 564).  *See also, e.g., City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination:  they may diminish the credibility of the government's rationale for restricting speech in the first place.").

For example, in *Greater New Orleans Broadcasting Association, Inc. v. United States*, 527 U.S. 173, 190 (1999) the Court struck down a federal law that banned the advertising of commercial casino gambling.  The interest asserted to support the advertising ban was limiting demand for gambling, particularly on the part of compulsive

gamblers. *Id.* at 189. The law, however, permitted advertising by government-operated, nonprofit, tribal, and "ancillary" commercial casinos. *Id.* The Court concluded that the law was "so pierced by exemptions and inconsistencies" that "there was little chance that the speech restriction could have directly and materially advanced its aim." *Id.* at 190, 193. Similarly, in *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), the defendant contended that a federal prohibition on advertising alcohol content on beer labels unlawfully restricted the speech rights of brewers. *Id.* at 478-79. The government argued that the ban was needed to suppress the threat of "strength wars" between brewers, in which each brewer increased alcohol content relative to others as a way of attracting customers. *Id.* at 479. But as the brewers pointed out, most states permitted brewers to disclose the alcohol content of their beers in advertisements, even if they were barred from including it on beer labels. *Id.* at 488. And manufacturers were permitted to characterize some beers as "malt liquor," an indication of a higher alcohol content. *Id.* at 489. The Court concluded that these exemptions rendered the restriction so underinclusive as to defeat its purpose. *Id.* at 488-89.

The law does not, however, impose upon government an all-or-nothing choice in regulating commercial speech. The Supreme Court and other federal courts have recognized that a statute regulating commercial speech may contain exceptions to a general ban without rendering the statute underinclusive. In *Metromedia*, the Supreme Court upheld a city ordinance that permitted billboards engaged in onsite advertising (i.e., describing the commercial activities conducted at the premises on which the billboard was located), but not those engaged in offsite advertising (describing the commercial activities of another location). *Metromedia, Inc.*, 453 U.S. at 510-11. The

Court concluded that the differential treatment was not unconstitutional even though the ban permitted many billboards, as the ban on offsite advertising still advanced the City's interests in traffic safety and aesthetics. *Id.* at 511. The Court also noted that the city reasonably could believe offsite advertising, due to periodically changing content, could impose a greater burden upon the City's interests than onsite advertising. *Id.*

Likewise, in *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009), the Ninth Circuit upheld a city ordinance that restricted offsite commercial advertising signs, but not onsite commercial or noncommercial signs. *Id.* at 902, 909. Faced with an underinclusiveness challenge, the court reasoned that the exceptions did not undermine the interests that the sign ordinance was intended to advance, as the ordinance still reduced the overall clutter created by signs. *Id.* at 910. The court also noted that the City of Los Angeles found that offsite advertising posed "a more acute problem" than other types of advertising, because offsite advertising featured content that periodically changed. *Id.* The Ninth Circuit also distinguished the ordinance from the law at issue in *Greater New Orleans.* Whereas the ban on commercial casino advertisements at issue in *Greater New Orleans* was so underinclusive that gamblers "would simply redirect their business to Indian casinos instead of private casinos," the sign ordinance advanced the City of Los Angeles's interests by reducing the overall number of billboards. *Id.* at 911. *See also Contest Promotions, LLC v. City & County of San Francisco*, 874 F.3d 597, 603 (9th Cir. 2017) (concluding that a sign ordinance was not fatally underinclusive, when "the distinctions that it makes among different kinds of speech relate empirically to the interests that the government seeks to advance.")

First, RCP argues in a footnote that the sign ordinance is underinclusive because

it does not address advertisements posted under the City's contract with JCDecaux. Pl.'s Mot. for Summ. J. at 16 n.2.  The City entered into a contract with an advertising entity, JCDecaux, to permit certain advertising on City-owned "street furniture," such as bus stops, train stations, and other publicly-owned surfaces.  D.E. 69, Pl.'s Ex. 20 at CITY001461 ("Coordinated Street Furniture Program Agreement").  Under the contract, JCDecaux "agreed to be responsible for the design, fabrication, installation, maintenance, operation, removal, and dismantlement of various pieces of street furniture . . . at no cost to the City."  *Id.*  Thus the agreement with JCDecaux does not adversely impact many of the City's asserted interests:  litter, visual clutter, and damage to City property are all mitigated under this arrangement.  Moreover, similar regulatory schemes—banning commercial signs but excepting commercial signs posted in accordance with a contract between the City and an advertiser—have been upheld. *Metromedia,* 453 U.S. at 509; *Metro Lights*, 551 F.3d at 909.  The exception for the JCDecaux advertisements does not render the sign ordinance so underinclusive that it fails to advance the City's interests.

RCP also argues that the City's failure to ban noncommercial signs renders the sign ordinance fatally underinclusive.  RCP contends that political signage, one type of noncommercial signage, produces the same problems that commercial signs do but are left unregulated by the sign ordinance.  This, in the Court's view, is essentially a variation on the argument about commercial versus non-commercial signs that the Court rejected in the previous section.  In any event, the short answer to RCP's argument is that the law does not leave the City with a binary choice of banning all signs or banning none.  So long as the choices the City makes regarding which types of signs

to regulate are not otherwise constitutionally infirm, *cf. Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) (exceptions for some types of political content but not others likely would not pass muster), it does not have to eliminate the entire perceived ill all at once. Here the City has chosen to target commercial signs, the type of signs that it reasonably believed imposed the lion's share of the adverse impact on its asserted interests. In any event, as the City contends, political signs typically are put up only during election seasons, so they do not constitute as great a burden as types of signs that are posted year-round.

RCP also argues that signs posted by non-profits, which it contends are also noncommercial signs, pose as great or greater a problem as commercial signs, because non-profits experience all the same incentives that commercial entities face but have less resources to channel into paid advertising. RCP concludes that for this reason, signs posted by non-profits pose a greater problem than commercial signs in terms of impact on the City's asserted interest. But this argument is speculative; RCP does not support it with evidence, and it otherwise lacks foundation in the record.

In sum, the Court overrules RCP's underinclusiveness argument. As discussed earlier, the City has introduced evidence showing that most posted signs are commercial in character. This evidence is sufficient to establish that the sign ordinance directly advances the legitimate governmental interests that the City asserts. As far as the limitation to commercial advertisements is concerned, the sign ordinance is more like the regulations upheld in *Metromedia*, *Metro Lights*, and *Contest Promotions* than those struck down in *Greater New Orleans* and *Rubin*. *See also United States v. Edge Broad. Co.*, 509 U.S. 418, 429 (1993) ("We [have] made clear . . . that our commercial

speech cases require a fit between the restriction and the government interest that is not necessarily perfect, but reasonable.").

### 4.    The availability of lesser restrictions

RCP argues that the sign ordinance also fails because there are a number of other ways that the City could have advanced its asserted interests without banning commercial signs, such as restrictions in certain locations, restrictions on the total number of postings, or restrictions on how a posting may be affixed to City property. First, it is not clear that these less-restrictive means would adequately advance the City's interests in reducing clutter and promoting traffic safety, which likely are implicated by the addition of any signs, no matter how or where these signs are posted. Second, even if there were another means of restricting signs, RCP misstates the burden facing the City. "The [City] is not required to employ the least restrictive means conceivable, but it must demonstrate . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Greater New Orleans*, 527 U.S. at 188. The City's prohibition on the single largest source of the sign problem is a solution that reasonably fits the problems the City has identified.

Finally, RCP argues that a parade of horribles will follow from a decision upholding the City's restriction on commercial signs. Specifically, RCP contends that if the blanket prohibition on commercial signs is upheld, nothing will stop the City from barring commercial speakers from "leafletting, engaging in door-to-door solicitation, or using of sound trucks . . . effectively eliminating underinclusiveness challenges to prohibitions of commercial speech." Pl.'s Mot. for Summ. J. at 24. The short answer to

this is that the availability of alternative forms of communication is, as the Court has discussed, a meaningful element in the analysis of the propriety of restrictions on commercial speech. And under *Central Hudson*, a governmental entity may regulate non-misleading commercial speech only if there is a "fit between the legislature's ends and the means chosen to accomplish those ends." *Posadas*, 478 U.S. at 341. In the present case, the City has presented uncontroverted evidence that shows that the volume of commercial signage affects the City's asserted interests in a way that noncommercial signage does not. Any other restriction that the City might choose to impose in the future likewise will have to pass muster under *Central Hudson* and other applicable decisional law.

### 5.     Conclusion

In sum, the Court concludes that the City's sign ordinance comports with *Central Hudson* as a permissible regulation of commercial speech. The ordinance directly advances the City's interests, its exemption of noncommercial signs does not render it underinclusive, and it is not more extensive than is necessary to serve the City's asserted interests.

### B.     Vagueness

Next, RCP asserts that the sign ordinance is void for vagueness due to its failure to define its key term, "commercial advertising material." Before addressing the merits of RCP's argument, the Court must address whether RCP has standing to assert a vagueness challenge.

### 1.     Standing

The City argues that RCP lacks standing to bring a vagueness challenge. Under

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 18-19.  RCP correctly contends, however, that the sign ordinance does not "clearly proscribe" its conduct.  RCP, a non-profit organization, advertised a film that exhorts revolutionary political change.  Even though there was an admission fee, it would be difficult to say that its posters *clearly* constituted "commercial advertising material."  RCP is in a similar position to the plaintiff who asserted a vagueness challenge in *Buzdum v. Village of Germantown*, No. 06-C-159, 2007 WL 3012971 (E.D. Wis. Oct. 12, 2007).  The court in that case concluded the plaintiff had standing to challenge terms in an ordinance regulating "sexually oriented businesses" because the plaintiff, an individual who occasionally attempted to present nude or semi-nude dancing in his tavern, could reasonably doubt his conduct was covered by the ordinance.  *Id.* at *18-19.  RCP has similarly engaged in conduct reasonably viewed as on the margins of the coverage of the sign ordinance, the opposite of conduct that was "clearly proscribed."  As a result, RCP possesses standing to bring a vagueness challenge.

### 2.    Merits

Even though the Court has determined that the First Amendment does not prohibit the City from distinguishing between commercial and non-commercial speech in regulating signs on City property, that does not insulate the sign ordinance from scrutiny on other grounds.  RCP also challenges the ordinance's ban on posting "commercial advertising material" on the ground that this term, which the ordinance does not define, is unconstitutionally vague.

The Due Process Clause does not require "perfect clarity and precise guidance" in statutory enactments. *Ward v. Rock Against Racism*, 491 U.S. 781, 894 (1989). To sustain a vagueness challenge, a plaintiff must show the law "fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010). And the degree of vagueness that the Constitution tolerates partly depends in part on the nature of the enactment; for example, more vagueness is typically tolerated in a statute that imposes civil as opposed to criminal penalties. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982); *see also Sherman*, 623 F.3d at 519. When, however, First Amendment rights are at stake as they are in this case, "rigorous adherence" to the standards of due process is required. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

RCP argues that the sign ordinance is impermissibly vague because it leaves the term "commercial advertising material" undefined. This is particularly problematic, RCP argues, for persons or organizations wanting to post signs that arguably involve both commercial and noncommercial messages. That is the situation with RCP's sign. It advertised an essentially political event (the showing of a film with a political message) that involved payment of money (a modest fee for admission). It is also easy to come up with other situations in which a person or organization wanting to post a sign would find it quite difficult to know which side of the line it was on. For instance, a political candidate who posts a sign featuring a link to her campaign website conceivably could run afoul of the sign ordinance—if, say, the website offered items for

sale—but how would she know for sure?  And a business that wanted to post signs supporting a Fourth of July celebration, a gay pride event, or an anti-gun control rally and identify its business and address on the sign would have an equally difficult time determining whether City officials would consider its sign to be a "commercial advertising material."

Significant evidence supporting RCP's vagueness claim comes from the City itself.  In its responses to RCP's interrogatories, the City said that it defines "commercial advertising material" as "printed material that offers goods or services in exchange for money or other forms of remuneration; that reference, describe, or promote goods or services that may be so offered; or that reference, describe, or promote businesses or other enterprises that offer such goods or services."  Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 34.   But the City's designated Rule 30(b)(6) witness regarding enforcement of the sign ordinance by the Department of Transportation testified that it prohibits *any* posting affixed to City property, irrespective of what the sign says.  *Id.* ¶ 35.  And Cole Stallard, a deputy commissioner of the City's Department of Streets and Sanitation, testified during his deposition that a poster distributed by RCP with information about its political philosophy, invited people to joint its mailing list, and offered a way to make donations would be a "commercial advertisement."  *Id.* ¶ 73.  He also stated that the poster for which RCP was ticketed would have been a "commercial advertisement" and prohibited even if it just promoted free online viewing of RCP's film and did not list a ticket price for a live showing, because the poster refers to "Revolution Books," which "seems to be an entity that sells books."  *Id.* ¶ 61, 63.  These definitions may all overlap, but they also have fundamental inconsistencies.

A reasonable person likely would not believe that an exchange of money is contemplated is enough to make a message "commercial advertising material" under a law that does not define that term. What about, for example, a flyer posted by an educational institution promoting an event with a presentation by a political figure for which a modest admission fee (say $5) is charged? To cite another example, the local Federal Bar Association chapter periodically invites members—particularly younger members—to have lunch with a federal judge in small groups, and charges $10 to partially defray the cost of lunch. These events, from the FBA's perspective, serve an educational purpose; most reasonable people would not consider this to be commercial activity. How would a reasonable person determine whether a flyer promoting such an event, posted on a light pole on Plymouth Court, right outside of The John Marshall Law School, would constitute prohibited "commercial advertising material"? Or what if the flyer referenced the event but made no express reference to the price for lunch and just referenced the FBA chapter's website? A reasonable person would have no way of knowing whether such flyers constituted commercial advertising material under the ordinance, which does not define that term, the key term in the ordinance. Under the definition cited by the City in its interrogatory answer and at least some of the alternative definitions that City representatives offered, these flyers potentially would be prohibited.

The Court concludes that for these reasons and others, the ordinance's failure to define "commercial advertising material" renders the ordinance unconstitutionally vague, given the impact on activity protected under the First Amendment. Parties like RCP, who wish to communicate a political message through a ticketed event, have no guidance on whether their sign will violate the ordinance. Likewise, enforcing officials

are enabled to make wholly subjective and arbitrary decisions—raising the possibility that signs promoting unpopular causes or events may draw a citation, while others will escape sanction. The absence of a definition of this key term is fatal to the ordinance.

In *International Society for Krishna Consciousness v. Rochford*, 585 F.2d 263 (7th Cir. 1978), the Seventh Circuit affirmed a district court's decision to overturn as unconstitutionally vague regulations enforced in Chicago's airports. *Id.* at 269. In relevant part, the regulations stated that "[n]o person except concessionaires and other lessees as permitted by contract with the City of Chicago shall sell anything for commercial purposes." *Id.* at 273. The plaintiff, "a religious organization that requires its members to disseminate and sell its tracts and solicit contributions in public areas," challenged the regulation on vagueness grounds. *Id.* at 267. The plaintiff contended that the regulation was too vague to resolve whether their practice of selling religious tracts was "commercial" in character. *Id.* at 269-70. The Seventh Circuit held that "the provisions are not drafted in a manner sufficiently precise to avoid the possibility of improper application by officials. . . . [The challenged regulation] could be viewed as prohibiting the sale of a religious tract for 'commercial purposes' either by the one wishing to sell or by the official charged with enforcement." *Id.* at 270.

The sign ordinance suffers from the same problems as the airport regulations at issue in the *Krishna Consciousness* case. RCP, a political advocacy organization, is no more able to determine which signs promoting its activities and events constitute "commercial advertising material" under the sign ordinance than the religious organization in *Krishna Consciousness* was able to determine if it was engaged in a "commercial purpose" in selling its religious materials. *Id.* at 270. Moreover, enforcing

officials lack any criteria of the type needed to structure decision-making, which makes arbitrary or discriminatory enforcement more likely. "[I]n some contexts, the failure to define the distinction between commercial and noncommercial speech might result in an impermissible delegation of authority." *Lavey v. City of Two Rivers*, 171 F.3d 1110, 1116 (7th Cir. 1999). Businesses sometimes engage in noncommercial conduct, like promoting a particular group or policy, and noncommercial entities sometimes engage in arguably commercial conduct, like selling tickets to a political film. The sign ordinance provides no guidance to aid enforcement officials in determining where the line between a violation and non-violation is drawn, leaving it to officials to rely on "wholly subjective" judgments in enforcing the ordinance. *See United States v. Williams*, 553 U.S. 285, 306 (2008).

The fact that some types of signs *clearly* constitute commercial advertising and thus are obviously subject to the ban is not determinative. The Supreme Court's cases in this area "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015). For example, a statute barring "unjust or unreasonable" grocery prices is impermissibly vague, even if charging $1,000 for a pound of sugar plainly would be unreasonable, and a statute prohibiting "annoying" conduct on sidewalks is likewise impermissibly vague, even if spitting on someone clearly would be annoying conduct. *Id.* For this reason, the Court disagrees with the City's contention that the sign ordinance is not vague because there are clear examples of "commercial advertising material," such as signs advertising oven repair, insurance, car washes, or tax preparation. Def.'s Mem. in Supp. of Mot. for Summ. J. at 19. Even

if there are instances in which the meaning of "commercial advertising material" can be clearly understood, this does not eliminate the fact that there are significant gaps in which individuals wanting to post signs and enforcing officials are left to make subjective judgments regarding compliance.

The City's history of interpretation and enforcement of the ordinance underscores the vague character of the sign ordinance. As indicated earlier, RCP points to deposition testimony from several City employees who provided conflicting accounts of what constitutes "commercial advertising material." A deputy commissioner with the Department of Transportation and tasked with enforcing the sign ordinance testified that a sign containing a website address in which goods and services are offered for sale would be restricted by the sign ordinance. Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 37. Another official stated that an advertisement for a CD release would be commercial, because, unless it said the CD was free, the advertisement is commercial. *Id.* ¶ 41. Likewise, the City's enforcement history, including the ticket issued to RCP, lends support to RCP's position, for it shows that individuals and officers must confront cases in which their attempts to interpret the statute are unmoored from any guidance or criteria. Def.'s LR 56.1 Reply Stmt. ¶ 81. The City argues that its enforcement history is analogous to inconsistent enforcement evidence regarding a District of Columbia ordinance, which the D.C. Circuit discounted in upholding the ordinance in *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391 (D.C. Cir. 2017). But *Act Now* is distinguishable. The D.C. Circuit discounted the significance of the enforcement record in that case because the law in question contained a clear definition that cabined the discretion of law

enforcement personnel. *Id.* at 411. The present ordinance has nothing of the kind. Similarly, the failure to adequately train the City employees who enforce the sign ordinance is more significant in the absence of a definition of "commercial advertising material."

The Court also disagrees with the City's contention that "commercial advertising material" has a "common-sense meaning," because the facts required to prove a sign fits within the ordinance are themselves unclear. *Williams*, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). The City, while responding to RCP's motion for summary judgment, states that a sign only falls within the sign ordinance if it "include[s] commercial speech; *i.e.*, promote a business or offer goods and services for sale." Def.'s Reply in Supp. of Mot. for Summ. J. at 12. But is that really the fact to be proven? The City also states that a sign falls within the sign ordinance if it "reference[s]" a business—a fact that could apply to far more signs. Def.'s LR 56.1 Reply Stmt. ¶ 34. Under the definitions that the City has put forward, a sign that says "Boycott Amazon.com" would run afoul of the ordinance under one definition, but not another. *See also Fox Television*, 567 U.S. at 254 (the FCC's shifting indecency standards meant that the government failed to provide broadcasters with the notice sufficient for a "person of ordinary intelligence"). There is no commonly understood common-sense meaning of "commercial advertising material," as the alternative definitions offered by the City and its personnel make clear.

The Court also rejects the City's contention that it should not be required to add

what it calls "needless bloat" by affixing definitions to each term used in the municipal code. "Commercial advertising material" is the sign ordinance's central term, the primary point on which determination of a violation hinges. The City cites to *Kolender v. Lawson*, 461 U.S. 352 (1983), to assert that due process does not require "impossible standards of clarity." But the Supreme Court went on to say, in the same sentence, that the law at issue did not pose "a case where further precision in the statutory language is either impossible or impractical." *Id.* at 361. The same is true here.

Finally, the Court is not persuaded by the City's reliance upon *Minority Television Project Inc. v. FCC*, No. C-06-02699EDL, 2007 WL 4570293 (N.D. Cal. Dec. 21, 2007). *Minority Television Project* addressed whether the term "promote" was vague, *id.* at *11, which is not germane to the issues before the Court. The case also resolved a motion to dismiss, not a motion for summary judgment. *Id.* at *12. The case does not provide persuasive guidance for the Court on the question presented here.

For these reasons, the Court concludes that the sign ordinance is impermissibly vague insofar as it depends on a finding that a sign is "commercial advertising material," due to the absence of a definition of that critical term.

**C.      Overbreadth**

Because the Court has concluded that the sign ordinance is impermissibly vague, it need not address RCP's overbreadth challenge. *See Kolender*, 461 U.S. at 359 n.8 (noting the overlap between vagueness and overbreadth, particularly in the First Amendment context).

**Conclusion**

For the foregoing reasons, the Court grants plaintiff's motion for summary

judgment [dkt. no. 66], finding that the absence of a definition of the term "commercial advertising material" in Chicago Municipal Code § 10-8-320 renders that provision unconstitutionally vague. The Court denies defendant's motion for summary judgment[dkt. no. 59]. The Court denies RCP's motion to exclude the City's expert witnesses [dkt. no. 56]. Counsel are to draft an appropriate judgment embodying the Court's conclusions and are to present an agreed proposed form of judgment, or alternative proposed forms if they are unable to agree, by no later than April 4, 2018. The case is set for a status hearing on April 5, 2018 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 31, 2018